**Ricky JOYNER, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 20S00–9804–CR–225.

Supreme Court of Indiana.

Oct. 4, 2000.

Cecelia J. McGregor, Goshen, Indiana, David Hoffman, South Bend, Indiana, Attorneys for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, James A. Garrard, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

RUCKER, Justice

After a trial by jury Ricky Joyner was convicted of murder in the strangulation death of co-worker Sandra Hernandez. In this direct appeal Joyner contends his jury was biased, his consent to search his home and car was invalid, he was denied the opportunity to present a meaningful defense, and the evidence was not sufficient to sustain the conviction. We disagree with each contention and therefore affirm.[1]

**Facts**

On March 2, 1992, Sandra Hernandez left her three and a half-year-old son with her parents and met Joyner for dinner. Hernandez never returned for her son and was never seen alive by her parents again. The following day Hernandez' parents filed a missing persons report with the Elkhart Police Department. In response to a request by an Elkhart police officer, Joyner drove to police headquarters and spoke with investigating officer Steve Ambrose. After Joyner signed a consent form, officers searched his apartment and car seizing a black plastic trash bag among other things.

Over a month later a farmer discovered Hernandez' decomposed body in a hay field in LaGrange County. The body was partially clothed lying face down on the ground, and a plastic trash bag which was tied in a knot around the neck covered the body's head. Expert testimony revealed that the trash bag was cut from the same roll of polyethylene film as a trash bag seized from Joyner's apartment. A later autopsy revealed that Hernandez died as a result of either strangulation, choking, or suffocation. Approximately a year later Joyner was arrested and charged with murder. Thereafter a jury convicted him as charged. This direct appeal followed. Additional facts are set forth below where relevant.

**Discussion**

**I.**

Joyner contends the trial court failed to ensure an unbiased jury. This contention is based on Joyner's claim that (a) the trial court allowed several references to race throughout the trial, (b) the trial court failed to excuse a juror and grant a mistrial when the juror informed the court that she had been threatened by a co-worker concerning her jury service, and (c) the trial court failed to interrogate the jury collectively to determine if any juror had discussed the case with third parties.

*A. References to race*

Joyner is African–American and Hernandez is Hispanic–American. Although the record is not altogether clear, apparently the jury pool was composed solely of members who were white with the exception of one African–American woman.[2] During *voir dire* both the prosecutor and defense counsel questioned jurors individu-

---

1. This is the second time this case has come before us. In the first appeal we reversed Joyner's murder conviction and remanded for a new trial on grounds that the trial court erroneously excluded evidence supporting Joyner's defense that the murder was committed by another person. *See Joyner v. State,* 678 N.E.2d 386, 390 (Ind.1997).

2. This potential juror was properly discharged because of her expressed views concerning members of the Hispanic community. R. at 604. Joyner claims no error in this regard.

ally and collectively concerning their views on race. For example, asking if anyone had a problem with the fact that Joyner was African–American, the prosecutor commented:

> He has every right you and I have as Caucasians; every right that a Hispanic American has; every right that the Chinese Americans have; every right the Japanese Americans have. Every right the American citizen has the Defendant has. And you have no right to hold it against him because of his race, color or creed. As I said before, his rights are your rights [sic].

R. at 605. In a colloquy between defense counsel and one potential juror the following exchange took place:

> Q. [Defense counsel] The Defendant in this case, as you can see, is an African–American gentleman; is that a problem for you?
>
> A. [Juror] That's fine.
>
> Q. [Defense counsel] is that a problem for you at all?
>
> A. [Juror] I have African–American students. I have Spanish American students. I found them to all be children and unique, and I don't care what color they are.

R. at 832–33.[3] In like fashion the prosecutor as well as defense counsel asked potential jurors about their views on the legal system, and high profile cases, including the widely publicized O.J. Simpson trial. The record also shows that the State called Hernandez' mother to testify. During cross examination defense counsel asked if she would have been happy knowing her daughter had gone to dinner with a black man, to which she responded "no." R. at 922.[4]

■■■ Characterizing this case as "racially charged" Joyner complains that the foregoing references tainted the jury.

Concerning the cross-examination testimony of Hernandez' mother, the error if any was of Joyner's own making. It was Joyner who posed a question about the mother's views on her daughter's dating habits. A defendant may not invite error and then complain on review. *Roach v. State*, 695 N.E.2d 934, 941 (Ind.1998). This issue is waived. In like fashion Joyner has waived any alleged error concerning comments made during *voir dire*. Defense counsel as well as the State questioned prospective jurors concerning their views about Joyner's race and the race of the victim.

■■■ Waiver notwithstanding, Joyner's claims fail on their merits. First, we disagree with Joyner's assertion that this case was "racially charged" or that references to race were made throughout the trial. Other than making the bald assertion, Joyner does not direct our attention to any portion of the record supporting the notion that the issue of race or ethnicity permeated the trial. Our independent review of the record fails to disclose any such notion as well. Second, it is clear to this Court that the references to race were essentially confined to *voir dire* examination. The purpose of *voir dire* is to determine whether a prospective juror can render a fair and impartial verdict in accordance with the law and the evidence. *Bradley v. State*, 649 N.E.2d 100, 106 (Ind. 1995). In this case, the references to race were obviously designed to gauge the impartiality of potential jurors and ensure that if selected the jurors would base their verdict on the evidence presented at trial and not be persuaded one way or the other by the race of the victim or the defendant. We find no error here.

### B. Refusal to discharge a juror and declare a mistrial

The record shows that in an *in camera* proceeding on a Monday morning before

---

3. The record shows the juror was seated without objection. R. at 843.

4. Joyner also complains that on direct examination Hernandez' mother referred to him as a "black" man correcting the prosecutor who referred to him as "African–American." We find nothing untoward here. Both references are commonly used interchangeably.

trial resumed, a juror informed the judge that she had been threatened over the weekend. Specifically, the juror recounted that while at work on the preceding Saturday she was approached by two male co-workers. One of the co-workers told the juror that unless she voted not guilty, he would tell the judge that the juror had been discussing the case. Apparently the co-workers were acquaintances of Joyner. The juror advised the judge that she in fact had not been discussing the case, and after speaking with her supervisor she decided to report the incident to the court. The juror assured the court that the comments of her co-worker did not in any way affect her ability to serve on the jury, and despite the comments she could still be fair and impartial to both the State and the defendant. R. at 1469. The juror also commented that other jurors may have been approached over the weekend as well.

Joyner moved to excuse the juror and moved for mistrial. His mistrial motion was premised on the fact that once the juror was excused there would exist an eleven person jury,[5] and that he was not inclined to agree to a trial of less than twelve jurors. See Ind.Code 35–37–1–1(b) (providing for a trial of less than twelve jurors where the defendant and prosecutor so agree). The trial court refused to excuse the juror and denied Joyner's motion for mistrial. The trial resumed, and at the end of the day Joyner moved the court to question each juror to determine whether anyone had discussed the case over the weekend. The trial court granted the motion and conducted an *in camera* interview with the individual jurors. Each juror assured the court that he or she had not discussed the case with anyone.

■ Article 1, Section 13 of the Indiana Constitution guarantees to a defendant the right to an impartial jury. Thus, a biased juror must be dismissed. *Harris v. State*, 659 N.E.2d 522, 525 (Ind.1995). Joyner

acknowledges the juror's statement that despite her co-worker's comments she could still be impartial. Nonetheless he contends bias can be inferred from the circumstances.

■ Although not making the specific claim, Joyner's argument implicates a challenge for cause. *See* Ind.Code § 35–37–1–5(a)(11) (a person called as a juror may be challenged for cause for, among other things "bias[ ] or prejudice[ ] for or against the defendant."). Whether to excuse a juror for cause rests within the sound discretion of the trial court. *Wisehart v. State*, 693 N.E.2d 23, 55 (Ind.1998). We will sustain the trial court's decision unless it is illogical or arbitrary. *Id.* A juror's bias may be actual or implied. *McCants v. State*, 686 N.E.2d 1281, 1284 (Ind.1997); *Block v. State*, 100 Ind. 357, 362 (1885). "Implied bias," which also allows removal of a juror for cause, is attributed to a juror upon a finding of a relationship between the juror and one of the parties, regardless of actual partiality. *See, e.g., Haak v. State*, 275 Ind. 415, 417 N.E.2d 321, 323 (1981) (bias implied where juror's spouse was hired as a deputy prosecutor on the first day of trial by the office that was prosecuting the case despite juror's statement that she did not think the relationship would make it difficult for her to render an impartial verdict).

■ Joyner does not allege actual bias on the part of the juror, and his reliance on implied bias is misplaced. The relationship here was not between the juror and anyone involved in this action. *See, e.g., McCants*, 686 N.E.2d at 1284 (no bias where one of State's witnesses worked at the same university as one of the jurors); *compare Mooberry v. State*, 157 Ind.App. 354, 358, 300 N.E.2d 125, 128, (1973) (bias established in rape trial where two members of the jury were acquainted with the victim). Rather, the relationship existed

---

**5.** The record shows that by this point in the trial, the two alternate jurors had been dis- charged.

between the juror and a co-worker who was neither a witness in this case nor involved in this action in any manner. On the facts presented we can find no bias implied or otherwise. The trial court's decision not to excuse the juror for cause was not illogical or arbitrary. In turn the trial court properly declined to declare a mistrial.

### C. Collective interrogation

Joyner also complains that rather than questioning the jurors individually *in camera* to determine whether anyone had discussed the case over the weekend, the trial court should have employed the procedures outlined by this Court in *Lindsey v. State,* 260 Ind. 351, 295 N.E.2d 819 (1973). Among other things the *Lindsey* procedure anticipates an in-court collective interrogation where there has been a suggestion that the jury has been exposed to improper and prejudicial publicity. *Id.* 295 N.E.2d at 824. The procedure has been extended to include extrajudicial comments made to jurors. *Daniels v. State,* 264 Ind. 490, 346 N.E.2d 566 (1976).

 Here, the trial court employed the precise procedure that Joyner requested. If there was error, then Joyner invited it. This issue is waived. Waiver notwithstanding, Joyner's claim still fails. Pursuant to *Lindsey,* once presented with the possibility of extrajudicial comments made to a juror, the trial court must first make a threshold determination of whether there is an actual likelihood of prejudice. If "the risk of prejudice appears substantial, as opposed to imaginary or remote" then the court must "interrogate the jury collectively to determine who, if any, has been exposed" and take additional remedial action. *Id.* 295 N.E.2d at 824; *see also Gregory v. State,* 540 N.E.2d 585, 589 (Ind.1989) (quoting *Lindsey,* 260 Ind. at 359, 295 N.E.2d at 824). Absent a showing in the first instance that the supposed extrajudicial comments actually raised a risk of substantial prejudice, the trial court has no responsibility to engage in a collective interrogation. Here, the record shows that no juror had discussed the case, and with the exception of one additional juror, no juror had even been approached by anyone commenting on the case.[6] The trial court could very easily have determined there was no risk of substantial prejudice necessitating an in-court interrogation of the jury. Thus, the trial court did not err in failing to conduct a collective in-court interrogation. In conclusion, we reject Joyner's contention that he was tried by a biased jury.[7]

### II.

Joyner next asserts the trial court erred by admitting over his objection certain items seized from his car and apartment along with related expert testimony. Spe-

---

6. When questioned, this juror advised the trial court that a person also approached her at work and said "I just want you to know that I am following the case and I think he's innocent." R. at 1633. The juror stated that she did not respond but "turned around and walked away." R. at 1634. When asked by the trial court "Do you feel that influences you either way—either for or against the State of Indiana or for or against the Defendant?" the juror responded "not at all. I felt she was really stupid to even say anything." R. at 1634.

7. In further support of his claim, Joyner points to certain comments the trial court made to another juror. The record shows that during one of the *in camera* interviews discussed *supra,* the trial court acknowledged

that the juror was planning to leave for a scheduled trip on a Thursday morning. Noting that the juror should make different travel plans, the trial court commented "[w]e'll probably get to the jury on Thursday so you should be okay to leave on Friday. Just so you don't have to wait until the last minute to change your plans." R. at 1632–33. Joyner argues that this comment "improperly influenced the juror by disregarding/implying the length of deliberations, to the detriment of the Defendant." Brief of Appellant at 16. Joyner cites no authority to support this proposition and we find none. In any event there is nothing in the record to support the notion that the comments influenced the juror in her deliberations.

cifically Joyner refers to a blanket containing fibers matching those found under Hernandez' fingernails and a trash bag matching the one found tied around Hernandez' neck. The items were seized as a result of a consent to search which Joyner contends was not valid.

The facts are these. The day after Hernandez' parents filed a missing persons report, Joyner drove unaccompanied to the Elkhart Police Department and spoke with Officer Steve Ambrose. After recounting that he had last seen Hernandez when he took her home following dinner and signing a statement to that effect, Joyner left the station. The next day Joyner again went to the station unaccompanied to speak with Officer Ambrose. Although not placing Joyner under arrest, the officer read Joyner his *Miranda* rights which Joyner acknowledged by signing. The record is not clear whether he actually signed a *Miranda* waiver. In any event the following exchange occurred thereafter:

[Officer]: I have a couple of things to ask you today.... We need to start looking for anything, just looking for anything. Looking in people's cars and stuff. Would you have a problem with us looking through your car?

[Joyner]: No, not really, but ... no, not really.

[Officer]: O.K. What it is I will show you a piece of paper, it's called a Waiver of Search and Seizure.

[Joyner]: I know about that already.

[Officer]: Oh, you do?

[Joyner]: Yeah. I know the law pretty good.

[Officer]: It's something that you will sign that just says, "hey, I don't have a problem with them looking through my car."

[Joyner]: No, I don't. I know what you are saying.

Following a brief discussion concerning the layout of Joyner's apartment, the exchange continued:

[Officer]: How about out there? Would you have a problem with us looking through that? Your apartment?

[Joyner]: I will have to talk to my lawyer first, but I don't think that it will be a problem.

[Officer]: You want to talk to your lawyer first? Who's your lawyer?

After a discussion about advice Joyner received from his co-workers, the following colloquy occurred:

[Officer]: So, you wouldn't have a problem with us looking through your car? Would that be O.K.?

[Joyner]: Like I said, I'll talk to my lawyer, but I don't think that would be a problem.

[Officer]: O.K. ... how about your apartment, then?

[Joyner]: I'll have to check with my lawyer.... I don't see it's a problem but they told me to check first.

After another brief discussion the following exchange:

[Officer]: Who do you need to call then? Let's go ahead and do that.

[Joyner]: I don't know his number, I'll have to go back to the shop to get it.

[Officer]: Well, who could you call then? I mean, who's number could I look up for you to call?

Joyner gave the officer a telephone number and he placed a call. Joyner then spoke with a co-worker while the officer left the room. Upon the officer's return the following exchange took place after a brief conversation about Joyner's earlier refusal to agree to take a polygraph test:

[Officer]: How about the other things I was talking about?

[Joyner]: She [fellow co-worker] consulted me to be cooperative, if there is something I feel comfortable with. As far as searching my car and my house, I guess I'll sign a waiver for that. If ya'll want to go through my house and car, fine. I'll sign a waiver right now.

Supp. R. (Videotaped Recording identified as State's Exhibit E). Joyner then signed the consent to search. *Id.*

Under the Indiana Constitution "a person in custody must be informed of the right to consult with counsel about the possibility of consenting to search before a valid consent can be given." *Torres v. State,* 673 N.E.2d 472, 474 (Ind.1996) (quoting *Jones v. State,* 655 N.E.2d 49, 54 (Ind.1995)); *see also Pirtle v. State,* 263 Ind. 16, 28, 323 N.E.2d 634, 640 (1975) ("a person who is asked to give a consent to search while in police custody is entitled to the presence and advice of counsel prior to making the decision whether to give such consent."). Giving an arrestee *Miranda* warnings before beginning interrogation does not sufficiently inform the arrestee of his right to consult with counsel before consenting to a search. *Jones,* 655 N.E.2d at 54.

The record is clear that Joyner was not advised he had a right to consult with counsel before consenting to a search of his car and apartment. However, we must determine whether the right to receive the advisement ever attached. The right can only be said to have attached if Joyner was in custody when he consented to the search. To determine whether a defendant is in custody "we apply an objective test asking whether a reasonable person under the same circumstance would believe themselves [sic] to be 'under arrest or not free to resist the entreaties of the police.'" *Torres,* 673 N.E.2d at 474 (quoting *Jones,* 655 N.E.2d at 55). As we declared in *Loving v. State,* 647 N.E.2d 1123 (Ind.1995), "[t]he test is how a reasonable person in the suspect's shoes would understand the situation." *Id.* at 1125.

The record shows that Joyner drove unaccompanied to the Elkhart Police Department on at least two occasions. At the time, officers were unsure if a crime had occurred and were merely investigating a report of a missing person. Although not specifically advising Joyner of the fact, Officer Ambrose testified at the motion to suppress hearing that Joyner was "free to come and go as he please[d]." R. at 501. Nonetheless, when the conversation ended Joyner simply "left the Police Department." R. at 502. *See Loving,* 647 N.E.2d at 1125 (an officer's knowledge and beliefs are relevant to the question of custody when conveyed through words or actions to the person being questioned). Joyner counters that he was considered a "suspect" which accounted for Officer Ambrose giving him *Miranda* warnings. According to Joyner the officer's actions make it clear that he was not free to leave. We disagree and find it persuasive that Joyner arrived at the police station on his own. Even where a person freely and voluntarily accompanies officers to police headquarters, there is no arrest. *Williams v. State,* 611 N.E.2d 649, 651 (Ind.Ct.App.1993). Here, Joyner was not accompanied by police officers. Further, Joyner was not detained when he decided to leave. *See Huspon v. State,* 545 N.E.2d 1078, 1081 (Ind.1989) (appellant not in custody where he "was unrestrained and had no reason to believe he could not leave."). We conclude that a reasonable person in the circumstances Joyner found himself would believe that he was free to resist the entreaties of the police. *See Torres,* 673 N.E.2d at 474. Accordingly, Joyner was not in custody at the time he consented to a search of his home and car. Thus, Joyner's consent to search is not deemed invalid on grounds that police did not advise Joyner that he had a right to consult with counsel before giving consent.

Joyner counters that his right to counsel was nonetheless violated because on three occasions he requested to speak with an attorney before he would consent to a search and the requests were not honored. Specifically Joyner asserts "the refusal of the detectives to stop the questioning after the request for counsel was made on numerous occasions calls for the suppression of any evidence admitted pur-

suant to the invalid consents." Brief of Appellant at 21.

■■■■ Under *Miranda* when a person *in custody* asks to be represented by counsel he "is not subject to further interrogation by the authorities until counsel has been made available to him...." *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Taylor v. State,* 689 N.E.2d 699, 704 (Ind. 1997). In this case, because Joyner was not in custody when he spoke with police, his right to consult with counsel was not violated. Further, interrogation includes "any words or actions on the part of police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Loving,* 647 N.E.2d at 1125. A consent to search is not a self-incriminating statement, and therefore a request to search does not amount to interrogation. *United States v. Saadeh,* 61 F.3d 510, 515 (7th Cir.1995); *United States v. Smith,* 3 F.3d 1088, 1098 (7th Cir.1993). On this additional ground we conclude the police did not violate Joyner's right to consult with counsel.

■■■■ The critical inquiry here is whether Joyner's non-custodial consent to search was otherwise invalid. Generally a search warrant is a prerequisite to a constitutionally proper search and seizure. *Perry v. State,* 638 N.E.2d 1236, 1240 (Ind. 1994). In cases involving a warrantless search the State bears the burden of proving an exception to the warrant requirement. *Short v. State,* 443 N.E.2d 298, 303 (Ind.1982). A valid consent is such an exception. In turn, a consent to search is valid except where procured by fraud, duress, fear, or intimidation or where it is merely a submission to the supremacy of the law. *Martin v. State,* 490 N.E.2d 309, 313 (Ind.1986).

■■■■ Nothing in the record shows that the police intimidated Joyner or engaged in fraud to procure his consent. The officer's request for Joyner's consent was straightforward. Unsure that a crime had been committed, officers of the Elkhart Police Department were simply investigating a missing persons report and "need[ed] to start looking for anything, just looking for anything. Looking in people's cars and stuff." Supp. R. Indeed in his initial response Joyner replied that he had "no problem" with consenting to a search of his car. Nor does the record show that Joyner was under duress, motivated by fear, or gave his consent out of submission to the supremacy of the law. Joyner twice went to the police station in an attempt to demonstrate his supposed cooperativeness in giving information on the whereabouts of the missing Sandra Hernandez. Even while indicating that he wanted to consult with counsel before consenting to a search, Joyner consistently said that he did not think it would be a problem to consent. Not only did Joyner acknowledge his familiarity with consent forms, but also the record shows that he was aware that co-workers at his place of employment had signed similar consent forms as a part of the missing persons investigation. *Id.* In fact Joyner spoke with a co-worker before signing the consent form. *Id.* We conclude that Joyner's consent to search was valid, and as a result the trial court did not err by allowing into evidence the items seized as a result of the search as well as the related testimony.

### III.

Joyner asserts that he was denied the opportunity to present a meaningful defense. In support Joyner claims: (a) the trial court did not allow him to introduce a police report into evidence; and (b) the trial court did not allow him to recall a witness on grounds that the witness violated a separation order while at the same time allowing the State to call a rebuttal witnesses who sat through the proceedings.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amend-

ment, [ ] or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, [ ] the Constitution guarantees criminal defendants 'a meaningful opportunity to present a defense.'" *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) (citations omitted). As the Supreme Court has also observed "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense.... Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense." *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1976).

### A. Introduction of the police report

The record shows Joyner called to the stand Elkhart police officer Arthur Kern. After questioning the officer at length about a conversation the officer had conducted with Hernandez' brother and a police report the officer prepared memorializing the conversation, Joyner passed the witness. The State then cross-examined the officer after which Joyner proceeded to redirect. During redirect examination Joyner sought to introduce the police report into evidence. The State objected on hearsay grounds and the trial court sustained the objection.

■ Hearsay is not admissible unless it falls within a specific exception provided by law or by the Indiana Rules of Evidence. *See* Ind. Evidence Rule 802. We first observe that information in police investigative reports may be admissible if it meets the requirements of Indiana Evidence Rule 803(8) and is offered by the accused. However, in this appeal Joyner does not challenge the trial court's ruling on grounds of Rule 803. Rather, he contends the document was needed to remedy deficiencies in the officer's memory and to "demonstrate his bias and that of [the victim's brother]...." Brief of Appellant at 36. Joyner argues the police report

showed that Hernandez' brother told Officer Kern that he saw his sister alive and not in Joyner's company late in the evening hours on the date the couple went to dinner. According to Joyner this was an accurate statement and supported the defense position that someone other than Joyner committed the murder. However, according to Joyner, neither the brother nor the officer could remember at trial what the brother had said. Thus, the argument continues, the police report should have been admitted: (1) to refresh the officer's recollection, and (2) to show that both the officer and the brother were biased against Joyner.

■ Although asserting bias, Joyner does not elaborate on this point. Nor does he explore how introduction of the police report would support such a claim. As for refreshing the officer's recollection, contrary to Joyner's assertion, the record shows that when questioned about the statement of Hernandez' brother, the officer apparently testified consistently with assertions contained in the police report. We say "apparently" because although marked at trial as a defense exhibit, the report is not contained in the record. Nonetheless we have carefully examined the record of Officer Kern's testimony where he talked about his conversation with Hernandez' brother and the police report he prepared as a result. R. at 1692–1695. Nothing in his direct, cross, or redirect examination suggests that Officer Kern testified contrary to the information Joyner alleges is contained in the report. Hence, the predicate for refreshing the officer's recollection was not met in the first instance. *See Montgomery Ward, Inc. v. Koepke,* 585 N.E.2d 683 (Ind.Ct. App.1992) (no error to refuse admission of a document where no basis existed to refresh witness recollection). Based on the grounds Joyner raises in this appeal, we conclude the trial court did not err in refusing to allow the police report into evidence.

## B. The separation order

Prior to the presentation of evidence, the trial court granted the State's motion for separation of witnesses declaring "[i]f there are any witnesses in the courtroom, you should leave the courtroom at this time. You are also admonished not to discuss your testimony nor what occurs in the courtroom with any other witness." R. at 891. Defense witnesses Jamie Carmen and Michael Miller violated the order by discussing the case in Carmen's home over a weekend after Carmen had testified at trial on the preceding Friday. Reviewing newspaper clippings from Joyner's first trial, both Carmen and Miller testified outside the presence of the jury that their memories had been refreshed concerning a blue or white conversion van someone had seen near the location where Hernandez' body was discovered and the black plastic bag associated with Hernandez' killing. The State filed a motion to prohibit Joyner from recalling Carmen to the stand and to prohibit Miller from testifying altogether. Although noting that both witnesses had violated the separation order, the trial court granted the motion with regard to Carmen but denied it with regard to Miller. Joyner complains the trial court erroneously excluded Carmen's testimony.

The determination of the remedy for any violation of a separation order is wholly within the discretion of the trial court. *Jordan v. State*, 656 N.E.2d 816, 818 (Ind.1995). We will not disturb the trial court's decision on such matters absent a showing of a clear abuse of discretion. *Id.* This is so even when the trial court is confronted with a clear violation of a separation order and chooses to allow the violating witness to testify at trial. *Id.*

Joyner seems to contend the trial court abused its discretion because Carmen's testimony was critical to his defense. He also argues that neither he nor defense counsel caused a violation of the order.

*See Cordray v. State*, 687 N.E.2d 219, 221 (Ind.Ct.App.1997) (holding it is prejudicial error to refuse to allow a witness to testify who has violated the court's witness separation order where the party calling the witness is not at fault for the violation). On this latter point, Carmen testified that no one ever told her not to talk about her testimony with any other witness. R. at 1651. Although the record is unclear, the parties appear to concede that Carmen was not present when the trial court entered its separation order and admonished the witnesses. Nonetheless, Joyner acknowledged to the trial court that it was his responsibility to advise his witnesses not to talk about the case and to explain the separation order. R. at 1666. Contrary to his contention in this appeal, Joyner was at least partially at fault for Carmen violating the order.

In any event, the record shows a defense witness testified that at or near the time Hernandez was reported missing, he observed a blue van near the location where Hernandez' body was ultimately discovered. According to the witness, he observed the driver remove from the back of the van what appeared to be a large black garbage bag. Joyner contends Carmen's testimony was critical because if he were allowed to recall Carmen to the stand, she would have testified that at the time of Hernandez' disappearance she worked for the same employer as Joyner and Hernandez. According to Carmen's proposed testimony a fellow employee, other than Joyner, had access to a blue/gray company van. Carmen also would have testified that employees routinely removed company trash bags and took them home.

We offer no assessment on how critical Carmen's testimony may have been to Joyner's defense. However, the record shows that over the State's objection Joyner was allowed to call Mike Miller as a witness. He, too, had violated the separation order.[8]

---

8. Miller acknowledged that he was not supposed to talk with any other witnesses concerning his testimony, but did so anyway. R. at 1734. The trial court allowed Miller to

Miller was also employed at the same place as Carmen, Hernandez, and Joyner. Although he could not pinpoint the exact time frame, Miller testified that a certain "two-tone gray van" was available for employee use. R. at 1725–26. He also testified that it was the habit of employees to take supplies home including large "dark green ... if not black" garbage bags. R. at 1729. In essence Miller testified to the same facts that Carmen would have testified had she been allowed. We conclude the trial court did not abuse its discretion by refusing to allow Joyner to recall Carmen as a witness.

■ After Miller testified the defense rested. In rebuttal the State called John Walton among other witnesses. Walton was the president of the company that employed Miller, Carmen, Joyner, and Hernandez. Not listed as a witness for either the State or the defense, Walton had attended much of the trial as a spectator. Over Joyner's objection the trial court allowed Walton to testify. Joyner claims error. We disagree. The record shows that Walton was called for the limited purpose of rebutting the testimony of Mike Miller. It was not possible for the State to anticipate calling Walton until it learned of Miller's proposed testimony. *See Jenkins v. State,* 627 N.E.2d 789, 799 (Ind.1993) (the nondisclosure of a rebuttal witness is excused when the witness is unknown and unanticipated). The record also shows that Walton was not present in court during Miller's testimony. Indeed defense counsel conceded as much to the trial court. R. at 1748. We conclude the trial court did not err in allowing the State to call Walton as a rebuttal witness. We conclude also that Joyner was not denied the opportunity to present a meaningful defense.

## V.

■ Joyner last challenges the sufficiency of the evidence. More specifically he contends there was no direct evidence showing he murdered Hernandez and the circumstantial evidence was not sufficient. When reviewing a claim of insufficient evidence, we consider only evidence that supports the verdict and draw all reasonable inferences therefrom. *Richeson v. State,* 704 N.E.2d 1008, 1011 (Ind.1998). We do not reweigh the evidence nor do we judge the credibility of witnesses. *Id.* We uphold a conviction if there is substantial evidence of probative value from which a jury could have found the defendant guilty beyond a reasonable doubt. *Id.*

■ It is true there was no direct evidence that Joyner murdered the victim. However, circumstantial evidence alone is sufficient to sustain a conviction. *Kriner v. State,* 699 N.E.2d 659, 663 (Ind.1998). The record shows that two days after Hernandez was reported missing, Joyner was observed with a number of scratch marks on his body. The record also shows that during the same time period Joyner reported that someone had burglarized his apartment gaining entry by breaking a window. Police investigating the reported burglary noted that the window had been broken from the inside. The State called as a witness Daniel Wayne Oliver, Joyner's cellmate while awaiting trial. Although Joyner did not tell Oliver that he actually murdered Hernandez, he did share other incriminating information. According to Oliver, Joyner admitted breaking his own window. When asked if Joyner said why he did so, Oliver recounted that Joyner told him he wanted to be able to say that someone had broken into his apartment in case the police found something when conducting the search. R. at 1155. Joyner also told Oliver that after he took Hernandez to dinner, the couple drove around drinking, his "hormones took over," they then went to Joyner's apartment, and "that's where the scratches took place." R. at 1158. Further, Joyner told Oliver

---

testify reasoning that the defense was not at fault for the violation. No issue has been raised in this appeal concerning the trial court's ruling on this point.

that thereafter he was riding around with Hernandez' body in his car wondering what to do and decided to take the body to LaGrange County so that police could not trace the body back to him in Elkhart County. R. at 1158. According to Oliver, Joyner also said that he wrapped the body in a garbage bag. R. at 1160. In addition to the foregoing testimony the State also called two forensic witnesses with expertise in the area of physical comparison examinations. After explaining the manufacturing process, both witnesses testified that the plastic bag covering the victim's head and the trash bag found lining a trash can in Joyner's apartment were at one time a part of the same roll of manufactured polyethylene film. One of the witnesses specifically testified that the bags "were physically connected to each other until they were cut and separated apart from each other. They were consecutive plastic bags ... end-to-end." R. at 1297. We conclude that the circumstantial evidence in this case was sufficient to sustain Joyner's murder conviction.

### Conclusion

We affirm the trial court's judgment.

SHEPARD, C.J., and DICKSON, SULLIVAN and BOEHM, JJ., concur.