## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 27 2017, 11:04 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Arvil R. Howe
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Bruce A. White, Jr., <br> *Appellant-Petitioner,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Respondent.* | July 27, 2017 <br><br> Court of Appeals Case No. <br> 20A04-1610-PC-2490 <br><br> Appeal from the Elkhart Circuit Court <br><br> The Honorable Terry C. Shewmaker, Judge <br><br> Trial Court Cause No. <br> 20C01-1208-PC-85 |

**Mathias, Judge.**

[1] Appealing the denial of his petition for post-conviction relief, Bruce A. White, Jr. ("White"), claims it was contrary to law for the post-conviction court to rule

that White's trial counsel was not constitutionally ineffective at his 2010 jury trial in Elkhart Circuit Court for the murder of Alphonso James ("James").

[2] We affirm.

## Facts and Procedural Posture

[3] In our unpublished affirmance of White's conviction on direct appeal, we stated the facts of his case as follows:

> On the evening of July 25, 2009, White, Charles Farrell ("Farrell"), and an unidentified third man drove to Elkhart[, Indiana,] to purchase two kilo[gram]s of cocaine from [James] for a price of $64,000. The men met Daron Tuggle ("Tuggle") at a convenience store, and then followed Tuggle's vehicle to the Old Farm Apartments. Upon their arrival at the apartment complex, the group found James and Noble Dennie ("Dennie") waiting for them. Tuggle, White, and Farrell got out of their vehicles and joined James and Dennie, and all five men entered an apartment.
>
> Once inside the apartment, James grabbed two packages of cocaine from a table. Farrell asked to look inside the packages, and Tuggle turned toward the kitchen to retrieve something to use to open them. At that time, Tuggle heard White tell James "give it up, Cuz." Tuggle turned back around and saw that White was holding a gun to James's head. Tuggle took a step forward, and Farrell pulled out a gun and pointed it at Tuggle, telling him not to move. James struggled with White, unsuccessfully attempting to disarm him. James then backed away as White continued to point the gun at him. Tuggle then heard a gunshot and James fell to the ground.
>
> Multiple other shots were fired, and Dennie knocked Tuggle to the ground. When the gunfire stopped, Tuggle looked up and saw that only he and James remained in the apartment. Tuggle

then got up and went over to check on James, who had been shot in the abdomen, but was still breathing. Tuggle called an ambulance, but James later died from the gunshot wound. A single .45 caliber bullet was recovered during James's autopsy. The police recovered seven .45 caliber shell casings, all of which were fired from one weapon, as well as six 9 [millimeter] shell casings, all of which were fired from one [other] weapon. No gun was seen or found on or near James.

White suffered three gunshot wounds during the shooting, and he later sought treatment at a hospital in South Bend. White told the treating nurse that he was walking near a local restaurant and "minding his own business" when "these guys just came up and shot him." The next morning, after reading about James's death in the newspaper, White fled to Indianapolis, where he stayed at a friend's house. . . . White [later] learned that a warrant had been issued for his arrest, and he fled to Atlanta, Georgia. While in Atlanta, . . . White was arrested, and before being fingerprinted, he admitted to the Atlanta police that he had shot someone and there was a warrant for his arrest in Indiana. Thereafter, White was extradited to Indiana and brought to the Elkhart County Jail.

On March 1, 2010, the State charged White with murder and felony murder. A three-day jury trial commenced on December 13, 2010, at which Tuggle testified for the State. At the conclusion of the evidence, White was found guilty of murder. The trial court held a sentencing hearing on January 6, 2011, and White was sentenced to an executed term of sixty-five years in the Department of Correction.

*White v. State*, No. 20A03-1101-CR-28, 2011 WL 4847740, at *1-2 (Ind. Ct. App. Oct. 13, 2011) (record citations omitted).

[4] White petitioned Elkhart Circuit Court for post-conviction relief on July 19, 2013. A hearing was held on April 7, 2016, at which White's trial counsel Carl

Epstein ("Epstein") testified. The post-conviction court entered findings, conclusions, and judgment denying White's petition on September 27, 2016.[1] This appeal timely followed.

## Standard of Review

It was White's burden to show his entitlement to post-conviction relief by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); *Ben-Yisrayl v. State*, 792 N.E.2d 102, 105 (Ind. 2000). In appealing the denial of his petition for post-conviction relief, White thus appeals from a judgment on which he bore the burden of proof, or from a negative judgment. *Id.* We affirm such judgments unless contrary to law, that is, unless the uncontradicted evidence leads unerringly and unmistakably to a conclusion opposite to that reached by the court below. *Id.* at 105-06. We review the post-conviction court's factual findings for clear error, error which leaves us with a definite and firm conviction that a mistake has been made, and its legal conclusions de novo. *Id.* at 106.

"In short, the question before us is whether there is any way the trial court could have reached its decision." *Id.* (quotations omitted). If so, we must affirm. *Id.*

---

[1] The court's careful findings and conclusions have greatly aided our review. We note that White seems to have deprived us of one page of them, *see* Appellant's App. Vol. IV, pp. 92–93, but our review has not been impeded thereby.

## Discussion and Decision

[7] The Sixth Amendment to the federal constitution protects the right of an accused to have the effective assistance of counsel for his defense. *Hanks v. State*, 71 N.E.3d 1178, 1183 (Ind. Ct. App. 2017), *trans. denied*. Counsel himself can deprive an accused of his Sixth Amendment right by failing to render adequate legal assistance. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 686 (1984)).

[8] To prevail on a claim that he has received ineffective assistance of counsel, a defendant must show deficient performance and prejudice. *Id.* That is, he must show first that counsel's performance fell below an objective standard of professional reasonableness, and second that there is a reasonable probability the outcome of the proceeding would have been different but for counsel's unprofessional errors. *Id.* Counsel's performance is presumed effective, and all significant decisions are presumed to have been made in the exercise of his reasonable professional judgment. *Id.* at 1184. We defer to counsel's broad discretion in making tactical and strategic decisions. *Id.*

[9] While White raises several individual allegations of ineffectiveness, "ineffective assistance of counsel is a single ground for relief no matter how many failings the lawyer may have displayed. Counsel's work must be assessed as a whole; it is the overall deficient performance, rather than a specific failing, that constitutes the ground of relief." *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005).

# I. Failure to Challenge Prospective Juror

White's first allegation of ineffectiveness is Epstein's failure to challenge, either for cause or peremptorily, a prospective juror, later the jury foreman, named "W." at voir dire. The record discloses the following regarding W.:

- At the outset of jury selection, the court self-deprecatingly noted, "[W.] and I are acquainted. He's been a county employee or working for the Veterans Office for 150 years, and I've worked for the county 150 years or so." Tr. p. 30.[2]

- The prosecutor asked W., "Anything about your involvement with county government, with the people in county government, you indicated you knew [the trial judge], that you think might affect your ability to be fair or impartial in this system?" Tr. p. 46. W. answered, "No." *Id.*

- The prosecutor asked W., "Are you familiar with anyone from the prosecutor's office in a friendly way?" Tr. p. 46. W. answered, "Yes." The prosecutor asked, "Any part of those relationships that might affect your ability to be fair and impartial?" *Id.* W. answered, "No."

- The prosecutor asked W. whether he was "the type of person that [would] be objective and only hold the state and the defense to whatever standard the law require[d.]" Tr. p. 51. W. answered, "Yes." *Id.* The prosecutor asked, "Are you going to want more than what the law requires?" *Id.* at 52. W. answered, "No." *Id.*

---

[2] We cite the multivolume but consecutively paginated trial transcript as "Tr." and the post-conviction hearing transcript as "P.C.R. Tr."

Epstein never sought to remove W. for cause or by using one of his ten allotted peremptory challenges. Ind. Code § 35-37-1-3(b) (ten peremptory challenges in noncapital murder cases); *see* P.C.R. Tr. p. 7.

[11]    At the post-conviction hearing, Epstein testified as to his decision not to challenge W. as follows:

> [W]hy I didn't strike that person at the time was probably because I was preoccupied by the overall number of individuals who I also thought were inappropriate for jury duty; but given the composition of the community, I ended up having to acquiesce to that at a certain point in time because, you know, you can only go through so many jurors. And I'm only allowed a certain number of peremptory strikes; and in this particular case, I couldn't make a strike for cause. . . . [G]iven the entire grouping of jurors, I felt that was about as good of a composition as we were going to get given the circumstances.

P.C.R. Tr. pp. 8, 26. Epstein was under the impression that, at the time W. disclosed he was "familiar with [some]one in the prosecutor's office in a friendly way," Tr. p. 46, he had no remaining peremptory challenges. P.C.R. Tr. p. 8.[3]

---

[3] Without citation to the record, White asserts Epstein was incorrect: he did in fact have remaining peremptory challenges. Appellant's Br. at 12. The post-conviction court does not appear to have found one way or the other; it only noted Epstein's testimony to this effect, Appellant's App. Vol. IV, p. 94, though its finding may be contained in the omitted page of its judgment order noted above. *See* footnote 1 *supra*. The State takes no position. *See* Appellee's Br. at 19-21. Our review of the voir dire transcript does not reveal how many peremptory challenges Epstein had remaining at the time of W.'s disclosure, or indeed whether Epstein used any of his peremptory challenges. Importantly, for purposes of this appeal, we assume arguendo that Epstein did in fact have peremptory challenges remaining when W. disclosed his familiarity with one or more employees of the prosecutor's office.

[12] An impartial, unbiased jury is guaranteed to a criminal defendant by the Sixth Amendment to the federal constitution and by Article I, Section 13, of our state constitution. *Whiting v. State*, 969 N.E.2d 24, 28 (Ind. 2012). A juror who is impartial and unbiased in the constitutional[4] sense "is one who is able and willing to lay aside his . . . knowledge and opinions, follow the law as instructed by the trial judge, and render a verdict based solely on the evidence presented in court." *Id.* (citing *Irvin v. Dowd*, 366 U.S. 717, 722–23 (1961)). Constitutionally biased jurors must be removed for cause, *id.* at 29, and defense counsel may be found constitutionally ineffective for allowing a constitutionally biased jury to be empaneled. *United States v. Lathrop*, 634 F.3d 931, 937-38 (7th Cir. 2011). But, their importance and antiquity notwithstanding, peremptory challenges in themselves have no constitutional dimension, *United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000), and defense counsel should be accorded great leeway[5] in acting on his "'hunches' and impressions" based on a prospective juror's "habits, associations, or 'bare looks'" in ways that are "difficult if not impossible to explain . . . ." *Oswalt v. State*, 19 N.E.3d 241, 246 (Ind. 2014).

[13] A juror may be actually or impliedly biased. *Caruthers v. State*, 926 N.E.2d 1016, 1020 (Ind. 2010) (citing *Joyner v. State*, 736 N.E.2d 232, 238 (Ind. 2000)).

---

[4] White cites only our state constitution, but our supreme court has not distinguished Section 13 and the Sixth Amendment in this context. *See, e.g., Whiting*, 969 N.E.2d at 28.

[5] The only substantive limits the United States Supreme Court has put on the exercise of peremptory challenges flow from the equal protection clause of the Fourteenth Amendment, not from the Sixth Amendment. *See Oswalt v. State*, 19 N.E.3d 241, 246 (Ind. 2014).

Implied bias "is attributed to a juror upon a finding of a relationship between the juror and one of the parties . . . ." *Joyner*, 736 N.E.2d at 238 (citing *Haak v. State*, 275 Ind. 415, 417 N.E.2d 321, 323 (1981) (juror's spouse hired as deputy prosecutor on first day of trial)). "[T]he question comes down to whether the relationship is close enough to assume bias." *United States v. Brazelton*, 557 F.3d 750, 754 (7th Cir. 2009). Consanguinity is close enough, *see id.*, as are victimization by the accused, *see id.*, and direct employment by the prosecuting agency. *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring). Any more distant connection requires the defendant to show actual bias; bias will not be implied. *Phillips*, 455 U.S. at 215 (defendant required to show actual bias where juror actively sought employment with prosecutor's office during trial); *see also id.* at 234 (Brennan, J., dissenting) (citing our supreme court's decision in *Haak* as called into question by the majority's holding in *Phillips*).

[14] White asserts that W. was removable for cause as actually or impliedly biased, and Epstein's failure to do so was ineffective; or, in the alternative, that Epstein was ineffective for failing to strike W. peremptorily.

[15] The post-conviction court found "no evidence in the record to support [White's] bald assertion" that W. was actually biased. Appellant's App. Vol. IV, p. 94. Neither have we. Other than the bare fact of his "familiar[ity] with [some]one from the prosecutor's office," Tr. p. 46, none of W.'s voir dire responses contained even a whisper of bias against White. W. three times unequivocally affirmed his willingness and ability to render a fair and impartial verdict in

accordance with the evidence and the law. *Id.* at 46, 52. That is all the constitution required. *See Whiting*, 969 N.E.2d at 28.

[16] Nor does the bare fact of W.'s "familiar[ity] with [some]one from the prosecutor's office," Tr. p. 46, describe a sufficiently close relationship to impute bias to W. It is not even clear that "[some]one," *id.*, referred to a prosecuting attorney; it could just as well have referred to an administrative assistant or a college intern. In any event, "familiar[ity] . . . in a friendly way," *id.*, certainly describes a relationship no closer than the interested, employment-seeking relationship rejected as giving rise to implied bias in *Phillips*. And W.'s friendliness with the trial judge is of no help to White either, because a relationship must be between "the juror and *one of the parties*," *Joyner*, 736 N.E.2d at 238 (emphasis added), to give rise to implied bias.

[17] W. was neither actually nor impliedly biased, and the trial court could not have granted a motion to remove for cause. Epstein therefore cannot have been ineffective by failing to so move.

[18] Nor was Epstein ineffective for failing to challenge W. peremptorily. Assuming arguendo that the Sixth Amendment may impose a duty on counsel to exercise peremptory challenges outside the narrow context of curing a trial judge's erroneous failure to remove a biased juror for cause, *see Ross v. Oklahoma*, 487 U.S. 81, 88 (1988), we are certain that duty was not imposed on Epstein here. Epstein testified that he thought the jury with W. on it "was about as good of a composition as we were going to get given the circumstances." P.C.R. Tr. p. 26.

W. was to all appearances a reasonable and fair-minded man, and peremptorily challenging him risked antagonizing the trial judge, with whom W. was friendly, or the other jurors, who thought highly enough of W. to elect him their foreman — all to no end, since, in Epstein's judgment, the jury was already "about as good" as he could have expected. *Id.*; *see People v. Thompson*, 997 N.E.2d 1232, 1234 (N.Y. 2013) (reasoning similarly in case of failure to peremptorily challenge forty-year friend of prosecuting attorney). This justification is independent of Epstein's presumably mistaken belief that he had no remaining peremptory challenges at the time W. made his disclosure. Not to challenge W. peremptorily was well within the reasonable professional competence required by the Sixth Amendment.

[19] Even if we declared Epstein's performance deficient on this point, White would still have to show prejudice.[6] This he has not undertaken to do, and we see no basis in the record for concluding that there exists a reasonable probability White would not have been convicted of James's murder but for W.'s presence on the jury.

[20] Epstein was not ineffective with respect to W. at the voir dire stage of the trial.

---

[6] *Strickland* prejudice would be presumed in the case of failure to challenge a biased juror, *see Hughes v. United States*, 258 F.3d 453, 464 (6th Cir. 2001) (declining to distinguish court error in empaneling biased jury, requiring reversal of conviction, from lawyer error in allowing biased jury to be empaneled); *Johnson v. Armontrout*, 961 F.3d 748, 755-56 (8th Cir. 1992), but we have concluded that W. was not actually or impliedly biased. Thus, White is not relieved of his burden to show *Strickland* prejudice.

## II. Impairment of Defense of Self-Defense

White's second allegation of ineffectiveness is that Epstein made White's defense of self-defense legally unavailable by mentioning during opening statement, and by allowing White to testify, that White was involved in a drug deal at the time he murdered James. This allegation misunderstands the law of self-defense.

The general rule of self-defense in Indiana is that a defendant wishing to raise it "must show that he was in a place where he had a right to be; did not provoke, instigate, or participate willingly in the violence; and had a reasonable fear of death or great bodily harm." *Wilson v. State*, 770 N.E.2d 799, 800 (Ind. 2002). The privilege founded on this showing does not evaporate merely because the defendant is committing a crime at the time he is allegedly defending himself. *Mayes v. State*, 744 N.E.2d 390, 394 (Ind. 2001). Rather, self-defense is unavailable only where there is "an immediate causal connection between the crime and the confrontation." *Id.*

This is only a specific application of the general rule: where the crime itself is a "provo[cation], instigat[ion], or participat[ion]" in violence, *Wilson*, 770 N.E.2d at 800, self-defense is unavailable. Put differently, the crime itself must "produce the confrontation wherein the force was employed." *Harvey v. State*, 652 N.E.2d 876, 877 (Ind. Ct. App. 1995), *trans. denied*. Robbery is an example of such a crime. *Mayes*, 744 N.E.2d at 394; *Henderson v. State*, 795 N.E.2d 473, 481 (Ind. Ct. App. 2003), *trans. denied*. Drug dealing, by itself and as a matter of law, is not. *Henderson*, 795 N.E.2d at 481 (holding jury not misled by court's

incomplete self-defense instruction because supplemented by defense counsel's statement, "[T]he State wants you to believe that the fact that he's there for a pot deal means that he can't claim self-defense. That's not the law, and that makes no sense."); *Smith v. State*, 777 N.E.2d 32, 36 (Ind. Ct. App. 2002) (holding murder defendant entitled to self-defense instruction where defendant went to victim's home "to purchase marijuana and repay part of a drug debt"), *trans. denied*.

[24] All of this was properly put before the jury at White's trial. The court instructed the jury on self-defense in relevant part as follows:

> Because a defendant is committing a crime at the time he is allegedly defending himself is not sufficient standing alone to deprive the defendant . . . of the defense of self-defense. Rather, there must be an immediate causal connection between the crime and the confrontation.
>
> A person who was actively engaged in the perpetration of a crime may assert self-defense if the criminal activity he engaged in did not produce the confrontation wherein force was employed.

Tr. pp. 938-39. Thus, it was correctly left to the jury to determine whether there was "an immediate causal connection" between the proposed cocaine sale and James's death as would cut off White's defense of self-defense, assuming the jury found the elements of self-defense not disproved beyond a reasonable doubt in the first place. *See Mayes*, 744 N.E.2d at 394 (holding issue properly submitted to jury); *see also* Appellee's Br. at 23 ("[Had it credited White's testimony], the jury could have determined that the drug deal could have been

concluded in a peaceful manner had it not been for James . . . attacking [White].").

[25] White appears to believe that, but for Epstein, the jury would have never heard anything at all about cocaine. This is nothing more than wishful thinking. White was never going to have a trial at which his presence in James's apartment went unexplained. It was the theme and theory of the State's case from its opening statement, Tr. p. 32 ("Ladies and gentlemen, Alphonso James was killed during a drug deal."), through its closing argument. *Id.* at 929 ("[White was] [t]he man who set everything into motion with the weapon and the violence, the man who's been dealing drugs, the man who went to get possession of drugs, the man . . . who tried to rob Alphonso James during a drug deal."). Epstein could not have kept it out of evidence, because it was central to a rebuttal of White's self-defense claim, and any minimally competent prosecutor would have been expected to raise it as such.

[26] Epstein was not ineffective with respect to White's defense of self-defense.

### III. Failure to Challenge Tuggle's Testimony

[27] White's third allegation of ineffectiveness is Epstein's failure to challenge certain testimony of Tuggle, the man who met White and Farrell at a convenience store before leading them to James's apartment and a critical witness for the State. The subject testimony was elicited by the State on redirect examination following Epstein's three-hour cross-examination of Tuggle, spanning 122 transcript pages. Epstein had sought *inter alia* to impeach Tuggle's

credibility by the fact that Tuggle had reached a plea agreement with the State whereby Tuggle would testify against Farrell and White in exchange for the State's dropping his lead charge of felony murder. The State elicited the following testimony from Tuggle regarding his experience after testifying at Farrell's trial:

[State:]      After testifying against Mr. Farrell, has that been problematic for you in the jail?

[Tuggle:]     A little bit, yeah.

[State:]      Okay. Have you had threats against you?

[Tuggle:]     Yes, ma'am.

[State:]      Against your family?

[Tuggle:]     Yes.

[State:]      Have you had threats against your loved ones?

[Tuggle:]     Yes ma'am.

Tr. p. 473.

[28]    White argues that, had Epstein objected to this testimony as lacking foundation, or had Epstein cross-examined Tuggle about it, White might have been spared the inference that *he* was the one who threatened Tuggle. It is well settled that "threats against potential witnesses [made by the defendant] as attempts to conceal or suppress evidence are admissible as bearing upon [the defendant's] knowledge of guilt." *West v. State*, 755 N.E.2d 173, 182 (Ind. 2001).

True, White *might* have been spared the inference that he personally threatened Tuggle — but, as Epstein testified at the post-conviction hearing, White might also have been subjected to direct, substantial evidence of it. Epstein "was concerned that the prosecutor . . . tried to create an inference that Mr. White was somehow . . . connected with the threats, and [he] didn't object because [he] thought that would only reinforce that [inference]." P.C.R. Tr. p. 10. Epstein did not further cross-examine Tuggle for a similar reason: he "was afraid that something might come out that would implicate Mr. White [in] threatening Mr. Tuggle . . . ." *Id.* at 11.

Whatever collateral inference the prosecutor may have sought to raise, the immediate purpose of her redirect examination was to rehabilitate Tuggle's credibility by showing that he was not, so to speak, "getting off easy" simply by making a deal with the State. This immediate purpose was several inferential steps removed from showing White's knowledge of guilt. It was well within Epstein's reasonable professional judgment not to risk taking those steps on the State's behalf by calling more attention to the threats than necessary.

Epstein was not ineffective with respect to Tuggle's testimony.

## IV. Failure to Object to State's Closing Argument

White's fourth allegation of ineffectiveness is Epstein's failure to object to the following remarks of the prosecutor on closing argument:

> [White's exculpatory testimony as to the men's relative positions
> in James's apartment before the shooting] just makes absolutely

no sense. Now, why is Bruce White trying to explain it like that? Because he's had the benefit, ladies and gentlemen, of sitting through the evidence as we all have to explain why the bullet had that certain trajectory.

Tr. pp. 889-90. White argues that it was deficient for Epstein not to object to the prosecutor's improper burdening of White's Sixth Amendment right to be present at trial.

[33] However, the prosecutor did not improperly burden White's Sixth Amendment right. Comment on a testifying defendant's opportunity to tailor his testimony is constitutionally permitted, and the trial court could not have sustained an objection to the prosecutor's comment here. *Portuondo v. Agard*, 529 U.S. 61, 69 (2000) ("[W]hen a defendant takes the stand, his credibility may be impeached and his testimony assailed like that of any other witness. . . . [T]he rules that generally apply to other witnesses — rules that serve the truth-seeking function of the trial — are generally applicable to him as well." (quotations and citations omitted)). Epstein was thus not deficient in failing to object to it.

[34] Epstein was not ineffective with respect to the State's comments on closing argument.

## V. Failure to Object to Failure to Give Lesser-Included Offense Instruction

[35] White's fifth allegation of ineffectiveness is Epstein's failure to object to the trial court's failure to give White's tendered final jury instruction on voluntary manslaughter.

[36] Voluntary manslaughter is a lesser included offense of murder, proved by all the elements constituting murder, plus the mitigating element of "sudden heat." *Champlain v. State*, 681 N.E.2d 696, 701-02 (Ind. 1997). Sudden heat is "sufficient provocation to excite in the mind of the defendant such emotions as anger, rage, sudden resentment, or terror, . . . excited emotions . . . sufficient to obscure the reason of an ordinary man." *Id.* at 702. Sudden heat "prevent[s] deliberation, exclud[es] malice, and render[s] a person incapable of cool reflection." *Dearman v. State*, 743 N.E.2d 757, 761 (Ind. 2001).

[37] The added element of sudden heat makes voluntary manslaughter "not a typical example" of lesser included offenses. *Watts v. State*, 885 N.E.2d 1228, 1232 (Ind. 2008). "Sudden heat must be separately proved. Therefore, if there is no serious evidentiary dispute over sudden heat, it is error for a trial court to instruct a jury on voluntary manslaughter." *Id.* This rule can operate in a defendant's favor:

> [*Watts* itself] illustrates how a voluntary manslaughter instruction in the absence of evidence of sudden heat can prejudice a defendant. One legitimate trial strategy for the defendant in a murder trial is an "all-or-nothing" one in which the defendant seeks acquittal while realizing that the jury might instead convict of murder. In a situation where a jury must choose between a murder conviction and an acquittal, the defendant might well be acquitted. But if the jury has voluntary manslaughter as an intermediate option, the defendant might be convicted of voluntary manslaughter as a "compromise." Such a verdict is inappropriate if unsupported by any evidence of sudden heat; moreover, an unsupported voluntary manslaughter instruction

deprives the defendant of the opportunity to pursue a legitimate trial strategy.

*Id.* at 1233.

[38] Epstein's tender of the voluntary manslaughter instruction notwithstanding, his decision not to object to or seriously contest the trial court's failure to give it flowed from his pursuit of the "legitimate trial strategy," *id.*, outlined in *Watts*:

> I think a large part of that was, you know, I was of the opinion that I was presenting an all or nothing defense; and, you know, some of the other instructions[, particularly as to self-defense,] would have been contradictory and, you know, . . . [tended] to establish a basis . . . for a compromise[] verdict. . . . [F]rom a lawyer's standpoint, when lawyers present contradictory arguments, then jurors give[] the lawyers less credibility in terms of their presentation, and that . . . tends to have an impact on the client's position.

P.C.R. Tr. p. 27. It was not deficient for Epstein to conclude that a voluntary manslaughter instruction legally and rhetorically undermined White's best chance for acquittal.

[39] To the extent that Epstein's failure to object to the trial court's proposed final instructions failed to preserve the issue for appeal, White was not prejudiced thereby. A trial court's rejection of a voluntary manslaughter instruction for lack of a serious evidentiary dispute as to sudden heat is reviewed for abuse of discretion. *Suprenant v. State*, 925 N.E.2d 1280, 1283 (Ind. Ct. App. 2010), *trans. denied*. In this case, the post-conviction court — and presumably the trial court

— found no "cognizable evidence of sudden heat. [White's] bald assertion that he acted in sudden heat just after the drug transaction . . . is not supported by the evidence presented at trial." Appellant's App. Vol. IV, p. 97. We agree.

[40] The portions of his own testimony White quotes here as creating a serious evidentiary dispute over sudden heat do no such thing. White testified that James pressed a gun to his side and that White then "kind of panicked . . . , like, jumped. . . . [I]t was more or less because of how hard he poked me with the gun. It kind of like hurt me like being touched with something cold to make me jump . . . ." Tr. p. 806. White tried to shake James off and then the shooting started. White took cover for "13 to 15 seconds," *id.* at 810, before he "went to retrieve [his] gun" from his pants pocket and returned fire. *Id.* at 809. In other words, White testified that he was startled and then took reasonable measures to defend himself. He did not testify that sudden rage or terror obscured his reason and rendered him incapable of cool reflection. Had the issue been presented to us on direct appeal, we could not have found that refusing White's tendered voluntary manslaughter instruction was an abuse of the trial court's discretion. Thus, White was not prejudiced by Epstein's failure to object to the trial court's proposed final instructions.

[41] Epstein was not ineffective with respect to the voluntary manslaughter instruction.

# Conclusion

[42] Finding White's arguments on the whole to be entirely meritless, we conclude that White has failed to show that the post-conviction court's denial of his petition for post-conviction relief was contrary to law. The judgment of the post-conviction court is therefore affirmed.

[43] Affirmed.

Kirsch, J., and Altice, J., concur.