Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT:

**DORI NEWMAN**
Newman & Newman, P.C.
Noblesville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**IAN MCLEAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| THOMAS DERROW, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 29A02-1405-CR-312 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE HAMILTON SUPERIOR COURT
The Honorable Gail Z. Bardach, Judge
Cause No. 29D06-1307-FD-5628

**December 10, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Thomas Derrow appeals his conviction for operating a vehicle with an alcohol concentration equivalent ("ACE") of .15 or more with a prior conviction within five years, a class D felony. Derrow raises one issue, which we revise and restate as whether the trial court committed fundamental error when it did not remove a juror after Derrow's counsel informed the court he had made a mistake in exercising one of Derrow's peremptory challenge selections, thereby depriving Derrow of an impartial jury. We affirm.

FACTS AND PROCEDURAL HISTORY

At approximately 6:00 p.m. on July 14, 2013, Fishers Police Officer Brendon Buehre observed Derrow's vehicle weaving within its lane, almost strike a curb when turning, and then overcorrect. Officer Buehre activated the emergency lights and siren of his patrol vehicle to initiate a traffic stop. Derrow pulled his vehicle into a Taco Bell parking lot and proceeded to pull into the drive-through lane. Officer Buehre exited his patrol vehicle, walked up to Derrow as he was attempting to order food, and instructed him to pull through and park in the lot. After Derrow parked his vehicle, Officer Buehre approached and smelled a strong odor of alcohol coming from him, noticed that he exhibited very poor manual dexterity and fumbled around, and that his eyes were watery and bloodshot. Officer Buehre instructed him to exit the vehicle and saw that Derrow was wearing flip-flop sandals and swim trunks which were slightly damp. Officer Buehre conducted three standardized field sobriety tests, each of which Derrow failed. After obtaining a search warrant to draw Derrow's blood, Officer Buehre obtained a sample of his blood, and, under alcohol analysis results, the toxicology report showed a

2

concentration of ".35 (g%)." State's Exhibit 3. Police discovered an empty 1.75-liter vodka bottle in Derrow's vehicle.

In an amended charging information filed in December 2013, the State alleged the following counts against Derrow: Count I, operating while intoxicated endangering a person as a class A misdemeanor; Count II, operating a vehicle with an ACE of .15 or more, a class A misdemeanor; Count III operating while intoxicated endangering a person with a prior conviction within five years, a class D felony; and Count IV, operating with an ACE of .15 or more with a prior conviction within five years as a class D felony. The State also alleged that Derrow was an habitual substance offender.

A jury trial was held on March 11, 2014. During voir dire, the court indicated that six jurors would be selected. The court asked the prospective jurors, among other questions, whether: any of them knew the deputy prosecutors, defense counsel, Derrow, the judge, the other prospective jurors, or the prospective witnesses; they had any personal knowledge or remembered hearing anything about the case; any of them felt they tended to be biased for or against the State or a defendant in a criminal case; any felt they were unable to keep an open mind; any had impairments making it difficult to serve as jurors; any had previously served as a juror or a witness; any were currently a defendant in a criminal case or on probation; any felt that testimony of a law enforcement officer should be given extra weight or the opposite; any had a claim against the State or Derrow; any had any reservations about the rule of law requiring them to presume Derrow's innocence throughout trial; and whether any of their close friends had been the victim of a crime. The transcript indicates that Juror No. 14 and Juror No. 15 did not

verbally respond to these questions. Some of the other prospective jurors responded affirmatively to several of the court's questions, and the court further questioned those prospective jurors regarding their responses. When the prospective jurors were asked if any of them, their immediate families, or their close personal friends ever served as a law enforcement officer, Juror No. 15 stated that a family friend was a law enforcement officer for the Cumberland Police. The court asked if Juror No. 15 talked to the officer about his or her work and if the fact that Juror No. 15 had a friend who was a law enforcement officer would affect the way Juror No. 15 considered the evidence, and Juror No. 15 responded "No" to both questions. Transcript at 70.

Following the court's questions, the prosecutor and defense counsel then asked additional questions of the prospective jurors. Defense counsel asked for a show of hands of those prospective jurors who believed a person could be involuntarily intoxicated, and then said "Okay. A lot of people. Looks like everybody." Id. at 106. Juror No. 1 indicated that "someone could put something in your food or drink" and that the person "would feel the effects of whatever it was that was put in their drinks." Id. at 106. Defense counsel asked "[d]o you think they could black out and do things they otherwise wouldn't do," and Juror No. 1 replied "[i]f that's one of the side effects of whatever was put into their drink, yes." Id. Defense counsel asked Juror No. 15 "what do you think about that," and Juror No. 15 replied "I agree," and when defense counsel asked "[d]o you think there's any other way to become involuntary [sic] intoxicated," Juror No. 15 stated "[n]ot that I know of." Id. at 106-107. Defense counsel asked the prospective jurors if they had heard of prescription medications that could cause a person

4

to sleepwalk, and several prospective jurors indicated they believed that some medications for sleep aid could cause sleepwalking. Several prospective jurors indicated they believed a person could possibly drive a car while involuntarily intoxicated. Juror No. 14 indicated that "[b]lack out to me would be kind of temporary" and "I don't believe that it would be prolonged." Id. at 119. Defense counsel asked Juror No. 14 if it was unbelievable that a person had no memory of her evening or of eating yogurt, and Juror No. 14 replied "I believe that she can have that memory – that she won't remember, but I don't believe that she would have been awake the whole time," that "[s]he may awake that 10 or 15 minutes when she went downstairs and had the yogurt, then she would probably go back to sleep," and that "I don't believe that she would black out the entire evening." Id. at 119-120. Defense counsel asked "[b]ut sleeping and walking and still be moving around," and Juror No. 14 said "[t]hat's correct." Id. at 120. Defense counsel asked "[a]nd still not have a memory of doing it. Do you think that's possible," and Juror No. 14 replied "[t]hat's possible." Id. After defense counsel questioned Juror No. 12, who stated that a person should not be texting or chatting while on certain medications "because you really don't know what you're doing," Juror No. 14 stated: "I do want to point out that I . . . have a seven year old son, and I do believe that he does sleepwalk. So, I have found him to move at night where his light is on and just put him back to bed and he's fine with it." Id. at 121-122. Juror No. 14 further stated: "I don't think it's a serious case because he won't remember the next morning but he's usually just in his room playing with his toys, got his light on, and I just tuck him back into the bed and he's fine." Id. at 122. Another prospective juror stated that the juror's daughter

5

would dress for school at 1:30 a.m. and have no recollection the following morning. Another prospective juror indicated that the juror used to sleepwalk as a child.

Following questioning by the prosecutor and defense counsel, the trial court stated: "You may bring me both sheets. All right. Don't anybody leave until I get through the whole list. The following jurors are excused: Juror Number 1, Juror Number 3, Juror Number 4, Juror Number 15, Juror Number 16, Juror Number 19, and Juror Number 21." Id. at 125. The court then asked counsel to approach and stated: "Okay. (indiscernible-due to noise) stuck with the person, since you both have them left, either one of you can exercise a peremptory against 25 as an alternate if you want to." Id. at 125-126. Both the prosecutor and defense counsel replied "I do not," and the bench conference ended. Id. at 126. Derrow's counsel then immediately asked to approach and stated: "This may be too late, but I made a numerical mistake and Mr. Derrow just – I had Number 15 and he had vice versa. He wanted 15 and he wanted to strike 14." Id. at 126. The court replied: "Fifteen's gone." Id. Derrow's counsel stated: "Okay. I'll explain to him that it's just an error we'll have to deal with later." Id.

During opening statements, Derrow's counsel stated that Derrow was going to assert the defense of involuntary intoxication. Defense counsel stated that the jury would hear that Derrow had an issue with insomnia, that his physician gave him a prescription drug, and that he took the drug for the first time, went to sleep, and woke up bewildered sitting in a jail cell. Derrow testified at trial that he took the dosage of medication he was prescribed, that within fifteen or twenty minutes he became very drowsy and fell asleep, and that the next thing he remembered was waking up in the jail. He indicated he did not

remember driving, putting his swim trunks back on, having a large bottle of vodka that was discovered in his vehicle, or drinking anything at the pool that morning before he went back into his apartment. During final arguments, defense counsel stated that Derrow was in the car, that he obviously had a lot of alcohol in his system, that he could not drive the car appropriately, and that is why the police officer stopped him. Defense counsel argued that Derrow did not act with conscious intent and did not know what he was doing. He argued that Derrow took his prescription medication, went to sleep in his pajamas, and later woke up, drank the vodka, and drove his vehicle while involuntarily intoxicated.

Following the presentation of evidence, the jury returned verdicts of guilty of the charges under Counts I and II, and Derrow entered a guilty plea with respect to the charges under Counts III and IV and admitted to being an habitual substance offender. The court ultimately merged the convictions under Counts I through IV into one conviction under Count IV for operating a vehicle with an ACE of .15 or more with a prior conviction within five years as a class D felony. The court sentenced Derrow to three years, to be served in the Indiana Department of Correction for his conviction under Count IV, enhanced by three years, executed as a direct commitment to the Hamilton County Community Corrections work release program, for the habitual substance offender enhancement.

DISCUSSION

The issue is whether the trial court committed fundamental error when it did not remove Juror No. 14 from the jury after Derrow's counsel informed the court he had

7

mistakenly exercised one of Derrow's peremptory challenges to strike Juror No. 15 or whether Derrow was deprived of an impartial jury. Derrow concedes that he did not request the trial court to remove Juror No. 14 from the jury. Nevertheless, he asserts that the trial court committed fundamental error by not allowing his counsel to correct the mistaken selection, or by failing to *sua sponte* correct the mistake, and that his fundamental right to an impartial jury was violated. He argues that, after the court stated "Fifteen's gone," his counsel did not request any relief and "acquiesced to the mistake and left Derrow without a remedy." Appellant's Brief at 10. He argues that his counsel could have made a motion to remove Juror No. 14 and that the trial judge could have offered the same relief *sua sponte*. He also notes that the defense theory was one of involuntary intoxication and blackout for a prolonged period of time and that Juror No. 14 told everyone during the jury selection process that she would not think that possible, and he requests a new trial.

The State maintains that parties are not constitutionally entitled to peremptory challenges, that the transcript of voir dire shows that Derrow's actual jurors were qualified, fair-minded and earnest in their desire to follow the law and hold the State to its burden of proof, and that Derrow had a fair trial. The State also argues that Juror No. 14 was not necessarily a better strategic choice for a peremptory challenge than Juror No. 15 because Juror No. 15 insisted that the only way someone might become involuntarily intoxicated, blackout, and do things they would not ordinarily do was if a third party slipped a drug into the person's drink and that was not the situation claimed by Derrow's counsel.

8

In his reply brief, Derrow argues that his trial counsel explained that he wanted Juror No. 15 and wanted to strike Juror No. 14, that his counsel stated he would tell his client that it would be dealt with later, that it was not dealt with later, and that the court, the State, and his counsel knew a mistake had been made and there was a juror seated that Derrow did not want. He argues that "[i]t is pretty clear this issue was not a strategic decision and it is clear that Derrow's counsel made a mistake and that was what was represented to the trial court." Appellant's Reply Brief at 1.

"To qualify as a fundamental error, an error must be so prejudicial to the rights of the defendant as to make a fair trial impossible." Black v. State, 829 N.E.2d 607, 610 (Ind. Ct. App. 2005) (citing Merritt v. State, 822 N.E.2d 642, 643 (Ind. Ct. App. 2005) (quoting Benson v. State, 762 N.E.2d 748, 755 (Ind. 2002))), trans. denied. The fundamental error exception to the waiver rule is an extremely narrow one, "available only when the record reveals clearly blatant violations of basic elementary principles of due process, and the harm or potential for harm cannot be denied." Id. In determining whether fundamental error occurred with regard to voir dire, we observe that "[t]he purpose of voir dire is to determine whether a prospective juror can render a fair and impartial verdict in accordance with the law and the evidence." Id. (citing Joyner v. State, 736 N.E.2d 232, 237 (Ind. 2000)). A trial court has broad discretion in controlling the voir dire of prospective jurors. Id.

In Ross v. Oklahoma, the United States Supreme Court stated in part that it "reject[ed] the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury," that it has "long recognized that peremptory

9

challenges are not of constitutional dimension," and that "[t]hey are a means to achieve the end of an impartial jury." 487 U.S. 81, 88, 108 S. Ct. 2273, 2278 (1988) (internal citations omitted). In addition, "[a]ny claim that the jury was not impartial . . . must focus not [on the challenged juror who was removed by the peremptory strike], but on the jurors who actually sat." Jackson v. Parke, 142 F.3d 439 (7th Cir. 1998) (citing Ross, 487 U.S. at 86) (brackets in original).

The record reveals that the parties submitted their peremptory strike selections to the trial court and that the court then excused the selected prospective jurors, including Juror No. 15. The court thanked the seven excused prospective jurors for their service and instructed the remaining jurors where to sit. After the court noted both parties had not used all of their peremptory strikes and they could exercise a peremptory challenge against the alternate juror and the parties declined to do so, Derrow's counsel approached the bench and stated he had made a mistake and that Derrow "wanted [Juror No.] 15 and he wanted to strike [Juror No.] 14." Transcript at 126. The court stated, "Fifteen's gone," and Derrow counsel stated: "Okay. I'll explain to him that it's just an error we'll have to deal with later." Id. According to the court, Derrow had peremptory challenges remaining. The record shows and Derrow concedes that he did not attempt to exercise any remaining peremptory challenge or otherwise request that Juror No. 14 be removed from the jury.

We further note that the responses of Juror No. 14 during voir dire as set forth above do not demonstrate that the placement of Juror No. 14 on the jury resulted in a biased jury. Juror No. 14 indicated upon questioning that it was possible that a person

10

could temporarily blackout and walk and move around and have no memory of those actions. Juror No. 14 also had a child who would sleepwalk and not remember his actions the following morning.

Based upon the record, we conclude that no violation of Derrow's right to an impartial jury occurred. Derrow has not demonstrated that the trial court's failure to *sua sponte* dismiss Juror No. 14 resulted in fundamental error or that he was deprived of an impartial jury. Derrow is not entitled to a new trial.

## CONCLUSION

For the foregoing reasons, we affirm Derrow's conviction for operating a vehicle with an ACE of .15 or more with a prior conviction within five years, a class D felony.

Affirmed.

BARNES, J., and BRADFORD, J., concur.