## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 12 2018, 10:03 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

| APPELLANT PRO SE | ATTORNEYS FOR APPELLEE |
|---|---|
| Sonny Davis<br>Westville, Indiana | Curtis T. Hill, Jr.<br>Attorney General of Indiana |
|  | Monika Prekopa Talbot<br>Supervising Deputy Attorney<br>General<br>Indianapolis, Indiana |

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

| | |
|---|---|
| Sonny Davis,<br>*Appellant-Petitioner*.<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | July 12, 2018<br><br>Court of Appeals Case No.<br>49A05-1710-PC-2328<br><br>Appeal from the Marion Superior<br>Court<br><br>The Honorable Kurt Eisgruber,<br>Judge<br><br>Trial Court Cause No.<br>49G01-0208-PC-211427 |

**Brown, Judge.**

[1] Sonny Davis ("Davis") appeals the denial of his petition for post-conviction relief. He raises a number of issues which we consolidate and restate as:

    I.    Whether he was denied effective assistance of trial and appellate counsel; and

    II.    Whether he is entitled to a new trial due to newly discovered evidence.

We affirm.

## *Facts and Procedural History*

[2] Davis dated Christina Light for a year and a half. *Davis v. State*, No. 49A05-0303-CR-140, slip op. at 2 (Ind. Ct. App. December 18, 2003), *trans. denied*. On August 8, 2002, Light went to stay with her aunt after having a problem with Davis. *Id.* Davis told Light's aunt Light was a "lying bitch" and he would come over and "beat the heck" out of her. *Id.* Light's aunt became afraid of Davis and asked Light to leave her home. *Id.* Light went to the house of her cousin Amy Heady ("Amy") and asked Amy's boyfriend, Kevin Milliner, to say that Light was not at home if Davis called. *Id.* Davis called several times, and both Amy and Milliner told Davis that Light was not home. *Id.* Sometime later, Davis went to Amy's residence, walked in despite being told Light was not present, found Light hiding under a bed, pulled her out by her hair, hit her on her back with a drill, held her down, repeatedly hit her on the head with a hammer, kept asking Light for the keys to the truck they co-owned, found the keys in Light's pocket, continued hitting Light, and eventually left. *Id.* at 2-3.

[3] The State charged Davis with attempted murder, burglary as a class A felony, robbery as a class A felony, aggravated battery as a class B felony, criminal confinement as a class B felony, two counts of battery as class C felonies, intimidation as a class D felony, criminal recklessness as a class D felony, domestic battery as a class A misdemeanor, battery as a class A misdemeanor, and interference with reporting a crime as a class A misdemeanor. *Id.* at 3. The State later alleged Davis was an habitual offender. *Id.*

[4] At trial, the prosecutor asked Indianapolis Police Officer Joseph Wells to describe his conversation with Light on her porch, and Davis's trial counsel objected on the basis of hearsay. The court overruled the objection and noted Davis's continuing objection. Officer Wells testified that Light told him that her ex-boyfriend came over to the residence and that Davis kicked in the door of the residence, entered the residence with a man named Antwan who held a gun on everybody, and started beating her with his fist.

[5] The prosecutor asked Paramedic Lisa Warren on direct examination what Light had said to her about how she had been injured, and Davis's counsel objected on the basis of hearsay. The court overruled the objection to the extent it related to the identity of Light's attacker. Warren testified that Light "did not say a name – she just said 'he did it,'" and when asked who "he" was in relation to Light, Warren answered: "A boyfriend." Trial Transcript Volume I at 62.

[6]     A hearing was held outside the presence of the jury during which the court asked Light if she understood that Davis would like to call her as a witness in his case-in-chief, and Light indicated she understood. The court invited Davis's counsel to ask Light questions, and Light's counsel stated that Light had Fifth Amendment rights that supersede her ability to answer any questions from Davis's counsel or from the State. The court stated: "Why don't we let her hear what the questions are and then you can advise her. What would your questions be, [Davis's counsel]." *Id.* at 187. In response to questions by Davis's counsel, Light stated that "[s]ome guy" with the street name of Beedaw struck her with a hammer, that she did not know his name, and that she told the police that Davis injured her because she wanted to see him locked up because she "found him cheating on [her] with somebody else." *Id.* at 188. Light's counsel stated that he was advising her not to answer these questions because it would lead to charges being filed. The court asked Light if she understood that the State had filed charges for obstruction of justice and that the State intended to prosecute her on those charges based upon the testimony she gives, and Light answered affirmatively. Light indicated that she did not want to testify and that she was going to exercise her Fifth Amendment privilege. Upon further questioning by Davis's counsel, Light stated that she recognized a letter that she wrote to the prosecutor that was marked for identification purposes as Defendant's Exhibit A. Light's counsel stated that Light was not competent, that Light had already invoked her rights under the Fifth Amendment twice since they began, and, after further discussion, indicated that Light was exercising her Fifth Amendment privilege.

[7]     After the State rested, Davis's counsel moved for a directed verdict on some of the counts, and the court granted the motion with respect to Count XII and denied the request with respect to the other counts. Davis's counsel called Light, and the court questioned her outside the presence of the jury and in the presence of Light's attorney. The court found Light to be a competent witness. Upon questioning by the court, Light indicated she understood that if she testified, there was the possibility she could give statements that would incriminate her in pending criminal cases, that she wanted to testify, and that she acknowledged her attorney's advice was to exercise her Fifth Amendment privilege. The prosecutor explained that Light potentially faced charges of obstruction of justice as a class D felony, assisting a criminal as a class C felony for attempting to procure statements from Amy and Milliner, and perjury as a class D felony for each falsehood for "potential penalties up to maybe fifteen years." Trial Transcript Volume II at 344. The prosecutor also stated that Light should be advised that she was involved in Child Protective Services matters with her children and that the prosecutor did not know what effect, if any, any convictions would have on those hearings. When asked by the court if she wanted to testify, Light answered: "Yeah – I mean – all I want to say is he didn't do it." *Id.* The court stated that Light wished to testify. The prosecutor asked if Light understood that she would be answering the prosecutor's questions as well, and, when asked by the court, Light indicated that she understood. Light then stated "can I plead the Fifth . . . ." *Id.* at 345. When asked by the court if she wanted to "plead the Fifth," Light answered affirmatively. *Id.* After further discussion, the court asked Light if she wished

to exercise her Fifth Amendment Privilege, and Light answered "Fifth Amendment." *Id.* at 347.

[8] Davis's counsel then indicated that he would like to offer into evidence Defendant's Exhibit A, which was the statement Light had previously testified was a true and accurate copy of the statement she submitted to the State. After some discussion, the court did not admit Defendant's Exhibit A.

[9] Davis testified that he had been dating Light for about a year and a half and was involved romantically with her on August 8, 2002. He testified that he had a date with Toya on August 8, 2002, he could not remember Toya's last name, and Light came over at dinner time and became upset due to Toya's presence. He stated that Light paged him, they talked on the phone, Light asked him for money, he felt there was something wrong from the tone of her voice, he went to check on her, he discovered blood all over the house, Light told him to leave, and he left and went to 1814 Rural. On cross-examination, Davis indicated that State's Exhibit 6 reflected that thirty calls were placed from his residence to Barbara Heady's residence and close to ten calls were placed to Amy's residence, that he stated earlier that he was at his residence with Toya that day, and that Toya was not present at the trial.

[10] The court admitted a Petition to File Belated Notice of Alibi Defense filed by Davis on October 4, 2002, as State's Exhibit 33. The petition alleged that Davis was at the Rural Inn, located at 2725 E. Michigan Street in Indianapolis, at 11:40 p.m. on August 8, 2002, the date and time that the offense occurred.

Davis had also filed a list of witnesses including Shanisha Crenshaw, Johnny Davis, and Melissa LNV. On cross-examination, Davis indicated that he had just testified that he was not at the Rural Inn and that none of the witnesses listed in his petition to file a belated notice of alibi were present at the trial.

[11] The jury was unable to reach a verdict on the charge of attempted murder and acquitted Davis of battery. *Davis*, slip op. at 3. He was convicted of the nine other counts. *Id.* The trial court sentenced him to fifty years for burglary, twenty years for aggravated battery, and a thirty-year habitual offender enhancement on the aggravated battery conviction. *Id.*

[12] On direct appeal, Davis challenged his burglary conviction and argued that the trial court's instruction regarding the element of "breaking" violated his due process rights under the Fourteenth Amendment to the United States Constitution and Article 1, Section 19 of the Indiana Constitution. *Id.* at 4. He also argued that the instruction contained a mandatory presumption. *Id.* at 6. We agreed that a portion of the instruction defining "breaking" was incorrect, held that the erroneous language was harmless, and affirmed. *Id.* at 5-6.

[13] On March 26, 2015, Davis filed an amended petition for post-conviction relief alleging that his trial and appellate counsel were ineffective and new evidence existed which would likely result in a different result on retrial. On May 12, 2015, the court held an evidentiary hearing at which Davis was represented by counsel. James Denning testified that he witnessed "Johnny striking the lady in the head with the hammer" on August 8, 2002, and that the man's full name

was "Johnny House." Post-Conviction Transcript Volume II at 18. When shown Petitioner's Exhibit A, a booking information sheet listing an individual's "Name" as "DAVIS JOHNNY," "Person Name" as "JOHNNY HOUSE," and "Aliases" as "DAVIS, JOHNNY," Petitioner's Exhibit A, Denning stated that person was Johnny House. He testified that he and Johnny were hanging out that day when "Tanisha" picked up him and Johnny and took them to a house which Johnny entered and stayed for five or six minutes. Post-Conviction Transcript Volume II at 21. He testified that a woman ran out of the house screaming, "Help, help. They were fighting. Help break up the fight." *Id.* at 23. According to Denning's testimony, he then saw Johnny striking a lady in the head numerous times with a hammer, Johnny ran out screaming, "I got the keys, I got the keys, let's go," he and Johnny entered a black Chevy S-10, and Johnny dropped him off at his home. *Id.* at 24. Denning testified that he had not seen Johnny since then until he was walking through a unit of the Wabash Valley Jail in 2012 when he saw Johnny and said, "Johnny, what's up," and the man responded, "I'm not Johnny." *Id.* at 25. Denning identified Davis as the person he ran into in prison. He acknowledged that he was currently serving a sentence for attempted robbery.

[14] Amy testified that she had previously testified that Davis had beaten Light. She indicated that the photograph of the person in Petitioner's Exhibit A looked like Davis. Davis's counsel asked Amy if it was possible that the person she believed back in August 2002 to be Davis could have been Johnny House, the prosecutor objected, and the court sustained the objection. Milliner stated that

he testified at trial that he witnessed Davis and that he saw Davis for two or three minutes. He also testified that the person in Petitioner's Exhibit A looked like Davis.

Tanisha Whiteside testified she knew Denning in 2002, Denning came to her with Johnny, asked her to drop them off, and told her he had to "go over there and handle some things." *Id.* at 42. She testified that she dropped them off, Denning and Johnny went into the home at the same time, she heard yelling and talking, and she pulled away. She testified that she realized that she had information that would have been important to Davis's situation "just last year" when she was at a family dinner where Davis's sister was present and she saw pictures of Davis. *Id.* at 46.

Davis testified that he did not have any way of knowing that Denning was at the scene, he was segregated from Light, and had no phone and mail privileges, and did not know Amy or Milliner. He also testified that his brother was in prison in Arizona and it was not likely that his brother would be brought in as a witness and admit that he did this offense.

On March 8, 2016, the court held a hearing at which Davis appeared *pro se*. Davis called Light as a witness, the prosecutor asked to know the theory for which Davis wished to call Light, and Davis stated in part that Light would testify that "it wasn't me, she tried to tell them that it wasn't me, that she was threatened the whole time." *Id.* at 62. The prosecutor then objected, asserted in part that it would provide the court with "a certified copy of a conviction under

– of [Light] for obstruction of justice that occurred after this for events arising directly out of this case in which she pled guilty to obstruction of justice."[1] *Id.* at 63. The court stated that Light's statement was already on the record when the trial court "went through all of this" and sustained the prosecutor's objection. *Id.* at 65.

[18] The State presented the testimony of Kristina Korobov who stated that she was a deputy prosecutor in the Marion County Prosecutor's office in 2002 and 2003, she remembered the case very well, and the only meeting she had with Light occurred with Light's attorney. She testified that she believed the prosecutor's office had served Light with a subpoena for a deposition, Light failed to appear, and the court may have become "involved in getting her to come to court." *Id.* at 69. Korobov testified that she believed some witnesses stated threats came from Light and that Light was charged with and ultimately pled guilty to obstruction of justice. Detective Reidenbach testified that he investigated this case, spoke with Amy and Milliner on August 9, 2002, they were both clear in identifying Davis, and they were able to identify Davis based upon their prior experience with him. The court admitted the police report from Davis's arrest as State's Exhibit 1, which stated in part that Davis gave the name of Johnny Davis and that his fingerprints came back as belonging to Davis. On September 19, 2017, the post-conviction court denied Davis's petition.

---

[1] State's Post-Conviction Exhibit 2 contains an abstract of judgment indicating that Light was convicted of obstruction of justice as a class D felony in 2003.

## *Discussion*

Before addressing Davis's allegations of error, we observe that Davis is proceeding *pro se*. Such litigants are held to the same standard as trained counsel. *Evans v. State*, 809 N.E.2d 338, 344 (Ind. Ct. App. 2004), *trans. denied*. We also note the general standard under which we review a post-conviction court's denial of a petition for post-conviction relief. The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence. *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004); Ind. Post-Conviction Rule 1(5). When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Fisher*, 810 N.E.2d at 679. On review, we will not reverse the judgment unless the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court. *Id.* "A post-conviction court's findings and judgment will be reversed only upon a showing of clear error – that which leaves us with a definite and firm conviction that a mistake has been made." *Id.* In this review, we accept findings of fact unless clearly erroneous, but we accord no deference to conclusions of law. *Id.* The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. *Id.*

## I.

The first issue is whether Davis was denied effective assistance of trial and appellate counsel. Generally, to prevail on a claim of ineffective assistance of counsel a petitioner must demonstrate both that his counsel's performance was

deficient and that the petitioner was prejudiced by the deficient performance. *French v. State*, 778 N.E.2d 816, 824 (Ind. 2002) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), *reh'g denied*). A counsel's performance is deficient if it falls below an objective standard of reasonableness based on prevailing professional norms. *Id.* To meet the appropriate test for prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Perez v. State*, 748 N.E.2d 853, 854 (Ind. 2001). Failure to satisfy either prong will cause the claim to fail. *French*, 778 N.E.2d at 824. Most ineffective assistance of counsel claims can be resolved by a prejudice inquiry alone. *Id.*

[21] When considering a claim of ineffective assistance of counsel, a "strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Morgan v. State*, 755 N.E.2d 1070, 1072 (Ind. 2001). "[C]ounsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption." *Williams v. State*, 771 N.E.2d 70, 73 (Ind. 2002). Evidence of isolated poor strategy, inexperience, or bad tactics will not support a claim of ineffective assistance of counsel. *Clark v. State*, 668 N.E.2d 1206, 1211 (Ind. 1996), *reh'g denied*, *cert. denied*, 520 U.S. 1171, 117 S. Ct. 1438 (1997). "Reasonable strategy is not subject to judicial second guesses." *Burr v. State*, 492 N.E.2d 306, 309 (Ind. 1986). We "will not lightly

speculate as to what may or may not have been an advantageous trial strategy as counsel should be given deference in choosing a trial strategy which, at the time and under the circumstances, seems best." *Whitener v. State*, 696 N.E.2d 40, 42 (Ind. 1998). In order to prevail on a claim of ineffective assistance due to the failure to object, the defendant must show a reasonable probability that the objection would have been sustained if made. *Passwater v. State*, 989 N.E.2d 766, 772 (Ind. 2013) (citing *Wrinkles v. State*, 749 N.E.2d 1179, 1192 (Ind. 2001), *cert. denied*, 535 U.S. 1019, 122 S. Ct. 1610 (2002)). We apply the same standard of review to claims of ineffective assistance of appellate counsel as we apply to claims of ineffective assistance of trial counsel. *Williams v. State*, 724 N.E.2d 1070, 1078 (Ind. 2000), *reh'g denied*, *cert. denied*, 531 U.S. 1128, 121 S. Ct. 886 (2001).

[22] Davis claims his trial counsel was ineffective for allowing Light's counsel to invoke the Fifth Amendment at a deposition, failing to object to judicial and prosecutorial misconduct that deprived him of Light's testimony, failing to request immunity for Light, failing to make a cogent argument why Light's voluntary testimony was admissible, and failing to object to the exclusion of Light's testimony. Davis appears to argue that his appellate counsel was ineffective for failing to raise the argument that his right to confrontation was violated when the trial court excluded Light's testimony and letters that exonerated him and that contradicted the State's proffered hearsay testimony.

[23] The Sixth Amendment Confrontation Clause establishes that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the

witnesses against him." U.S. CONST. amend. VI. The Sixth Amendment confrontation right, however, occasionally comes into conflict with the Fifth Amendment right against self-incrimination, *State v. Taylor*, 49 N.E.3d 1019, 1026 (Ind. 2016), which provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Recognizing this tension, "courts must watch vigilantly to ensure that the invocation [does] not 'effectively . . . emasculate the right of cross-examination itself.'" *Id.* (quoting *U.S. v. Zapata*, 871 F.2d 616, 623 (7th Cir. 1989) (omission in original) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 19, 106 S. Ct. 292 (1985))). While the due process clause of the Fourteenth Amendment and the compulsory process or confrontation clauses of the Sixth Amendment guarantee criminal defendants a "meaningful opportunity to present a defense," *Joyner v. State*, 736 N.E.2d 232, 242-243 (Ind. 2000), "the power to compel testimony is not absolute." *Kastigar v. U.S.*, 406 U.S. 441, 444, 92 S. Ct. 1653, 1656 (1972), *reh'g denied*. A trial court is authorized to determine whether an answer to a question proposed to a witness will incriminate the witness. *Duso v. State*, 866 N.E.2d 321, 325 (Ind. Ct. App. 2007).

[24] The exchange regarding whether Light would testify occurred in the courtroom, and she was represented by counsel. Based upon the exchange, we cannot say that the court advised Light of her right to avoid self-incrimination in a threatening or browbeating manner. Light was represented by counsel at trial and she ultimately decided not to testify. We cannot say that Davis's trial counsel was ineffective on this basis. *See Duso*, 866 N.E.2d at 326 (holding that

the defendant's Sixth Amendment right to compulsory process did not trump a witness's Fifth Amendment right against self-incrimination). To the extent Davis asserts that his trial counsel was ineffective for permitting Light's counsel to invoke the Fifth Amendment on Light's behalf, we observe that the portion of the trial transcript cited by Davis on appeal indicates that Light stated "they did not let me have a deposition" and "as soon as I was trying to say to them what happened, they didn't like what I had to say, so they basically did not give me a deposition." Trial Transcript Volume I at 194. The deposition of Light indicates that Light was present at the deposition, did not attempt to testify as to the incident, and did not disagree when her counsel stated that she would not give a statement at that time. We cannot say that Davis has demonstrated that his counsel was ineffective on this ground.

[25] With respect to Davis's assertion that his trial counsel was ineffective for failing to request immunity for Light, we observe that "Indiana, like many states, has enacted legislation giving prosecutors the authority to grant use immunity to witnesses and obviate the self-incrimination privilege of the fifth amendment." *Bubb v. State*, 434 N.E.2d 120, 123 (Ind. Ct. App. 1982). "Exercise of this power is limited to prosecutors." *Id.* Davis does not point to the record, and our review does not reveal, that Davis asked his trial counsel at the post-conviction hearing why he did not request that Light be afforded immunity. We also observe that his trial counsel objected to the testimony of Officer Wells and Paramedic Warren regarding their discussions with Light, informed the court that he wished to call Light as a witness, questioned Light in the presence

of the court, told the court that Davis was "insistent that I offer [Light] this exhibit [the letter Light allegedly wrote to the prosecutor] and ask her if it was hers," questioned Light about the letter, and asked Light if she was willing to testify about the events that occurred on August 8, 2002. Trial Transcript Volume I at 190. Trial counsel also asserted "it's our position – that my client didn't do this and that her evidence and her testimony is exculpatory in the matter." *Id.* at 193. Later, after the State rested, Davis's trial counsel again called Light. Again, we cannot say that Davis has demonstrated that his trial counsel's performance was deficient on this basis.

[26] With respect to Davis's argument that his counsel failed to challenge the admission of Officer Wells's testimony, the United States Supreme Court has explained that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 2273 (2006). "In making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant." *Michigan v. Bryant*, 562 U.S. 344, 358-359, 131 S. Ct. 1143, 1155 (2011). "To determine whether the 'primary purpose' of an interrogation is 'to enable police assistance to meet an ongoing emergency,' which would render the resulting statements nontestimonial, we objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." *Id.* at 359, 131 S. Ct. at 1156 (quoting *Davis*, 547 U.S. at 822, 126 S. Ct. 2266).

[27]    The facts here objectively demonstrate that the primary purpose of Officer Wells's discussion with Light was to enable police assistance to meet an ongoing emergency. First, Officer Wells's encounter with Light was at the scene rather than at the police station. Davis does not challenge the post-conviction court's finding that Officer Wells testified that, when he spoke to Light, she was soaked in blood and blood was pumping out of the wounds in her head. Second, because Light's statements were excited utterances, they "are considered reliable because the declarant, in the excitement, presumably cannot form a falsehood." *See Bryant*, 562 U.S. at 361, 131 S. Ct. at 1157. Third, because Davis had fled the scene of a violent attack and could not be located, a reasonable officer would have considered the threat to Light, first responders, and the public ongoing. *See id.* at 363-364, 131 S. Ct. at 1158. Fourth, Officer Wells quickly asked Light her identity and the identity of her assailant. He testified that "I was . . . trying to get right to the point – what had occurred and who did it." Trial Transcript Volume I at 32. There is no evidence suggesting that Officer Wells told Light that he needed Davis's identification for purposes of prosecution, and there is no reason to think that "a conversation which beg[an] as an interrogation to determine the need for emergency assistance . . . evolve[d] into testimonial statements." *See Bryant*, 562 U.S. at 365, 131 S. Ct. at 1159 (quotations omitted). Officer Wells's request for the identity of her attacker was information that allowed him to "assess the situation, the threat to [his] own safety, and possible danger to the potential victim and to the public, including to allow [him] to ascertain whether [he] would be encountering a violent felon." *See id.* at 376, 131 S. Ct. at 1166

(citations and quotations omitted). The circumstances of the encounter, as well as the statements and actions of Light and Officer Wells, reveal that Light's identification of herself and Davis were not testimonial statements. We cannot say that the Confrontation Clause barred their admission at Davis's trial. *See McQuay v. State*, 10 N.E.3d 593, 599 (Ind. Ct. App. 2014). Also, Davis has not demonstrated that the statements to Paramedic Warren were testimonial. *See Perry v. State*, 956 N.E.2d 41, 57 (Ind. Ct. App. 2011) (holding that the victim's statements to a medical provider were not testimonial). Accordingly, we cannot say that Davis's trial counsel or appellate counsel were ineffective on this ground.

## II.

[28] The next issue is whether Davis is entitled to a new trial due to newly discovered evidence. Generally, new evidence will mandate a new trial only when the defendant demonstrates that: (1) the evidence has been discovered since the trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) the evidence is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result at retrial. *Carter v. State*, 738 N.E.2d 665, 671 (Ind. 2000) (citing *Fox v. State*, 568 N.E.2d 1006, 1007 (Ind. 1991)). We analyze these nine factors "with care, as '[t]he basis for newly discovered evidence should be received with great caution and the alleged new evidence carefully scrutinized.'" *Id.* (quoting *Reed v. State*, 508 N.E.2d 4, 6 (Ind. 1987)). "The burden of showing

that all nine requirements are met rests with the petitioner for post-conviction relief." *Taylor v. State*, 840 N.E.2d 324, 330 (Ind. 2006).

[29] Without citation to the record, Davis argues that a comparison of the picture of Antwon Davis and Denning demonstrates how witnesses misidentified Antwon. He also asserts that certain facts in Denning's testimony are undisputable and establish the seventh and ninth prongs for determining whether new evidence mandates a new trial. He contends that the testimony of Whiteside, Amy, and Milliner corroborates Denning's account.

[30] With respect to the seventh prong, whether the evidence is worthy of credit, we note that the post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. *Fisher*, 810 N.E.2d at 679. The post-conviction court found Denning's testimony, "both in terms of his demeanor and credibility as a witness, and in light of the other eyewitnesses who testified, is not worthy of credit." Appellant's Appendix Volume 2 at 226. The court also found Denning's testimony "to be inherently unbelievable and contradictory with other witnesses at trial and at the Post-Conviction evidentiary hearing." *Id.*

[31] To the extent Davis relies on the testimony of Amy and Milliner, we note that the post-conviction court found that "the post-conviction testimony of Amy Heady and Kevin Milliner offered nothing substantive, except perhaps that [Davis] looks similar to a photograph of his brother." *Id.* Further, we observe that their testimony at the post-conviction hearing would merely be impeaching

of their own trial testimony. We cannot say that Davis satisfied the fourth prong of the test for newly discovered evidence. *See Coates v. State*, 534 N.E.2d 1087, 1098 (Ind. 1989) ("Furthermore, evidence that merely impeaches generally does not support a claim for a new trial based on newly discovered evidence.") (citing *Downs v. State*, 482 N.E.2d 716 (Ind. 1985)).

[32] As to the ninth prong, in determining whether newly discovered evidence would likely produce a different result at a new trial, the post-conviction court may consider the weight a reasonable trier of fact would give the evidence and may evaluate the probable impact the evidence would have in a new trial considering the facts and circumstances shown at the original trial. *Nunn v. State*, 601 N.E.2d 334, 337 (Ind. 1992). The newly discovered evidence must raise a strong presumption a new trial would achieve a different result. *Id.* Even if Amy and Milliner testified at a new trial, the State would have an opportunity to rehabilitate their testimony by introducing their prior testimony. As pointed out by the post-conviction court, Denning's testimony conflicted with Whiteside's testimony. We are not persuaded that Davis has raised a strong presumption a new trial would achieve a different result.[2]

---

[2] To the extent Davis appears to argue that the post-conviction court abused its discretion when it prevented him from presenting Light's testimony, Davis made similar arguments regarding Light's testimony at trial, Light had previously invoked her Fifth Amendment privilege, and the record already contained Light's statements that Davis did not beat her. With respect to his assertion that the trial court abused its discretion when it prevented post-conviction counsel from fully and effectively questioning witnesses, Davis cites to pages 37, 38, and 41 of the post-conviction transcript and we cannot say that these pages demonstrate that the trial court abused its discretion.

## *Conclusion*

[33]     For the foregoing reasons, we affirm the post-conviction court's denial of Davis's petition for post-conviction relief.

[34]     Affirmed.


Bailey, J., and Crone, J., concur.